IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GABRIEL GOMEZ and ADAM HEDBERG,<br><br>Plaintiffs,<br><br>v.<br><br>GARDA CL GREAT LAKES, INC., VILLAGE OF BROADVIEW, DETECTIVE DALE YURKOVICH, and CURTIS MEIGHAN,<br><br>Defendants. | Case No. 13 C 1002<br><br>Judge Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motions for Summary Judgment [ECF Nos. 137 and 142]. For the reasons stated herein, the Motions are granted.

### I. BACKGROUND

Except where noted, the following facts are undisputed, and where there is dispute, the facts are construed in the light most favorable to Plaintiffs as the non-moving parties. Moreover, the Court has considered the parties' objections to certain facts and includes in this background only those facts that are supported, relevant, and admissible.

Plaintiffs Gabriel Gomez ("Gomez") and Adam Hedberg ("Hedberg") (collectively, the "Plaintiffs") used to work for Defendant Garda CL Great Lakes, Inc. ("Garda"), which is a

private security company that provides armored transportation and delivery of money. Plaintiffs worked as armored vehicle operators tasked in part with transporting "e-cash bags," which are sealed bags that contain money to refill ATMs. An e-cash bag usually contains $40,000.00 separated into smaller plastic bags.

On December 19, 2011, Plaintiffs reported for work and checked out the required bags of money for their delivery route. One of those bags was an orange e-cash bag sealed with a green label. By the end of their route, Plaintiffs did not end up delivering the orange e-cash bag and checked it back in at the end of the day. On December 20, Plaintiffs again checked out the orange bag as they began their route. The orange bag was not delivered, but when Plaintiffs checked the bag back in, it was missing $10,000.00 and had a red seal instead of the original green seal. According to Garda, sometime during Plaintiffs' deliveries, the seal was broken, $10,000.00 was taken, and the bag was resealed. Plaintiffs, however, claim that someone took the money between their shifts on December 19 and 20 and that when they checked out the bag at the start of their shift on December 20, the money was already taken and the bag already had a red seal. Either way, the parties agree that the bag was missing $10,000.00.

It was not until December 23 that Garda discovered $10,000.00 was missing from the orange bag. Soon thereafter,

Garda's head of corporate security, Daniel Centrachio ("Centrachio"), started an internal investigation. Both Plaintiffs cooperated with Centrachio's investigation by submitting to polygraph tests and allowing Centrachio to interview them. After initially being placed on "stand-by status" sometime during the investigation, Plaintiffs returned to work on January 4, 2012.

About a month after Plaintiffs returned to work, Centrachio contacted Defendant Dave Yurkovich ("Yurkovich"), a detective in Defendant Village of Broadview's police department, to report the alleged theft of $10,000.00. Although Plaintiffs dispute the truth of some of Centrachio's statements to Yurkovich, the parties agree that Centrachio relayed the above facts to Yurkovich in addition to some other information, such as more details about the orange e-cash bag. He told Yurkovich that the orange bag contained within it two date-coded plastic bags that each held a $20,000.00 brick of money, and he also stated that only Plaintiffs would have had access to the orange bag on December 19 and 20.

Based on Centrachio's information, Yurkovich started a criminal investigation and contacted Plaintiffs. Yurkovich called Plaintiff Gomez on February 28, 2012, and asked him to go to the police station to provide fingerprints and give a statement. Gomez said that he wanted to speak with his attorney

before he went to the police station. On that same day, after speaking with his attorney, Gomez told Yurkovich that he would not give his fingerprints or a statement, asserting his Fifth Amendment privilege against self-incrimination. Yurkovich also left messages for Plaintiff Hedberg, who eventually returned Yurkovich's calls on March 3 and stated he too was asserting the Fifth Amendment.

During his investigation, Yurkovich contacted Centrachio and told him that neither Plaintiff would provide a statement or fingerprints. Centrachio responded that Garda had already handled the matter internally by firing Gomez and further stated that Garda was going to fire Hedberg. The parties dispute precisely when Plaintiffs were fired, but because, as discussed below, Defendants are entitled to summary judgment either way, the Court will presume that Plaintiffs are correct that Gomez and Hedberg were fired on February 29, 2012 and March 5, 2012, respectively.

After Plaintiffs' terminations, Yurkovich continued his investigation by obtaining their fingerprint cards from Garda and submitting those cards, along with the plastic bags that were inside the orange e-cash bag, to the Illinois State Police ("ISP") Crime Lab. An ISP lab report dated March 19, 2014, stated that a "suitable latent [fingerprint] impression" on one of the internal plastic bags "was made by the person whose

fingerprints appear on the fingerprint card marked . . . Gomez." [Opp. to Garda's Mot. for Sum. Judgment ("Opp. Br."), Ex. 28, ECF No. 140-3]. Without having any statement from Plaintiffs, however, Yurkovich did not seek felony charges and closed his investigation in April 2014.

Plaintiffs' Third Amended Complaint contains four counts. Count I alleges that Yurkovich and Defendant Curtis Meighan ("Meighan"), Plaintiffs' supervisor at Garda, violated 42 U.S.C. § 1983 by retaliating against Plaintiffs after they asserted their Fifth Amendment privilege. Count II alleges that Yurkovich and Meighan conspired to deprive Plaintiffs of their constitutional rights in violation of § 1983. Count III seeks indemnification from the Village of Broadview as Yurkovich's employer. Finally, Count IV contains a common law retaliatory discharge claim against Garda and Meighan.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party satisfies its burden and "shows that there is no genuine dispute as to any material fact and [the party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party, and a fact is "material" if it might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party satisfies its

burden, the non-moving party must present evidence sufficient to demonstrate that a genuine factual dispute exists. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). In doing so, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Sarver v. Experian Info. Solutions,* 390 F.3d 969, 970 (7th Cir. 2004). Rather, the non-moving party must demonstrate "through specific evidence that a triable issue of fact remains on issues for which [that party] bears the burden of proof at trial." *Knight v. Wiseman,* 590 F.3d 458, 463-64 (7th Cir. 2009).

### III. ANALYSIS

Counts I and II, and by extension III, are premised on § 1983 liability and are against Meighan and Yurkovich. Meighan, however, is not a state actor, which is a pre-requisite for § 1983 liability claim. *Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1016 (7th Cir. 2000). Moreover, Count I alleges that Yurkovich retaliated against Plaintiffs by terminating them, despite the undisputed fact that Yurkovich could not and did not fire Plaintiffs. Thus, Plaintiffs first three claims would seemingly fail as to each independent Defendant.

But a private citizen can be liable personally under § 1983 if that citizen conspired with a state actor in the alleged constitutional deprivation. *Id.* And, provided there is such a conspiracy, Yurkovich can be held liable for Plaintiffs'

terminations because "'the overt acts of one conspirator are attributable to all co-conspirators.'" *United States v. Soto,* 48 F.3d 1415, 1425 (7th Cir. 1995). Thus, Plaintiffs' only hope of succeeding on Counts I, II, or III necessarily depends on the Court first finding that Plaintiffs have established a conspiracy, or at least presented sufficient evidence to warrant a trial on the conspiracy issue. Therefore, the Court will first analyze the conspiracy issues in Counts I, II, and III and then the common law retaliatory discharge claim in Count IV.

### A. Plaintiffs' Conspiracy Claims

The parties agree that Meighan and Yurkovich never spoke to each other directly, yet Plaintiffs claim that Meighan and Yurkovich were involved in a conspiracy to deprive Plaintiffs of their Fifth Amendment privilege. According to Plaintiffs, the conspiracy was achieved through the use of Centrachio as an "intermediary" who spoke with both Meighan and Yurkovich and relayed to each of them information obtained from the other.

"[A] private citizen cannot ordinarily be held liable under Section 1983 because that statute requires action under color of state law." *Brokaw,* 235 F.3d at 1016. But, "if a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability." *Id.* "To establish Section 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s)

reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Fries v. Helsper,* 146 F.3d 452, 457 (7th Cir. 1998).

Although there is no direct evidence that Meighan and Yurkovich agreed to retaliate against Plaintiffs, indirect evidence can establish the existence of a conspiracy. "[I]f the agreement is not overt, the alleged acts must be sufficient to raise the inference of mutual understanding (*i.e.,* the acts performed by the members of a conspiracy are unlikely to have been undertaken without an agreement)." *Amundsen v. Chi. Park Dist.,* 218 F.3d 712, 718 (7th Cir. 2000) (internal quotation marks omitted).

Plaintiffs' allegations of conspiracy may have been sufficient to survive a motion to dismiss, but at the summary judgment stage they have failed to establish enough facts to substantiate their claim. Their argument rests on the combination of two facts: (1) Centrachio and Yurkovich spoke on the phone during their respective investigations, and (2) each took actions "within minutes of speaking with one another." [Opp. Br. at 10]. These two facts, according to Plaintiffs, are sufficient to allow a reasonable jury to infer that a "meeting of the minds" occurred whereby Yurkovich and Meighan agreed to deprive Plaintiffs of their rights. The Court disagrees.

Plaintiffs rely primarily on *Pantaleo,* which involved a plaintiff who was involuntarily injected with a drug after becoming agitated at a hospital. *Pantaleo v. Hayes,* No. 08 C 6419, 2013 WL 5311450, at *2–4 (N.D. Ill. Sept. 20, 2013). In that case, the plaintiff's family duped him into going to a hospital for treatment of some prior erratic behavior, and the morning after his overnight stay, he became agitated and barricaded himself in his room. *Id.* Hospital staff called the police, who arrived and spoke directly with the staff regarding the situation. *Id.* at *2–3. The staff indicated that they had already decided to give the plaintiff a psychotropic drug against his will and that the police were there so they could "use their powers" to help the hospital administer the medicine involuntarily. *Id.* at *3. Following their conversation, the hospital staff and police entered the plaintiff's room. *Id.* at *4. The plaintiff was uncooperative, leading one of the police officers to tase him. *Id.* The plaintiff then calmed down and agreed to take the drug. *Id.* The plaintiff's mental health later stabilized and he sued the hospital and its staff, and the Village of Hinsdale and its police officers involved in the incident. *Id.* at *1, 4.

The plaintiff brought several claims, one of which was excessive use of force under § 1983. *Id.* at *10. The plaintiff sought to hold both the officers and the hospital staff liable

based on an alleged conspiracy.  *Id.*  The court found that the evidence was sufficient to "create a question of fact as to whether defendants joined together with a common goal of administering psychotropic medication to [the plaintiff] in violation of his constitutional right to refuse such medication." *Id.*  The court especially focused on the direct conversation between the officers and the hospital staff, the contents of which were known and showed that the officers were asked specifically to use their authority to help the staff administer drugs involuntarily.  *Id.*

Plaintiffs argue that the facts in the present case are "even stronger" than *Pantaleo* in showing a meeting of the minds between Yurkovich and Meighan.  Not so.  Unlike the private actors in *Pantaleo* who asked the officers specifically to use their state authority to help them give the plaintiff drugs against his will, here there is no evidence that either Meighan or Centrachio asked Yurkovich to use his authority to deprive Plaintiffs of any rights.  This was the central factor that led the *Pantaleo* court to deny summary judgment; thus, Plaintiffs' reliance on *Pantaleo* is misplaced.

Plaintiffs insist, however, that the timing of the phone calls in relation to their termination is enough to allow a jury to infer that a meeting of the minds took place.  The evidence only establishes, at most, that Centrachio and Yurkovich kept

each other informed of what was happening in their respective investigations. As far as the Court is aware, there is nothing inappropriate about a detective keeping a reporting party informed about the status of an investigation or vice versa, and Plaintiffs have not pointed to any authority showing this type of communication to be inappropriate. Moreover, the existence of phone calls between two alleged co-conspirators is not enough to establish a conspiracy. *Goetzke v. Ferro Corp.,* 280 F.3d 766, 777–78 (7th Cir. 2002). In order to hold private actors liable under § 1983, Plaintiffs must produce evidence of a conspiracy that rises above mere speculation. *Id.* (finding that evidence of numerous phone calls between two defendants "merely proves that [they] remained in contact" and that, "[t]o assert that the calls are evidence of a conspiracy is simply speculation"); *see also, Williams v. Seniff,* 342 F.3d 774, 786 (7th Cir. 2003).

Plaintiffs have produced no evidence that Yurkovich agreed with either Meighan or Centrachio to threaten Plaintiffs with termination if they did not give up their Fifth Amendment privilege, nor have they produced evidence that Centrachio or Meighan agreed with Yurkovich to fire Plaintiffs for not providing a statement. The most that Plaintiffs can prove is that Yurkovich knew that Garda planned on firing Plaintiffs and that Centrachio knew that Plaintiffs were asserting the Fifth Amendment. Once again, this only shows that Yurkovich and

Centrachio were in contact with one another about their investigations. A jury would have to engage in a healthy amount of speculation to find that Yurkovich and Meighan had a "meeting of the minds" by which they conspired to retaliate against Plaintiffs for asserting their Fifth Amendment privilege. Thus, Plaintiffs have failed to establish a conspiracy and, as explained above, Counts I, II, and III cannot survive absent a conspiracy. Therefore, Defendants are entitled to summary judgment on those counts.

### B. Plaintiffs' Common-law Retaliatory Discharge Claim

Plaintiffs also argue that Meighan fired them for an impermissible purpose under Illinois' law. To succeed on a retaliatory-discharge claim, Plaintiffs must prove that (1) they were discharged, (2) in retaliation for their activities, and (3) that the discharge violated a clear mandate of public policy. *Bourbon v. Kmart Corp.,* 223 F.3d 469, 472 (7th Cir. 2007). There is "no precise definition of the term" public policy, but the Illinois Supreme Court has explained that it "concerns what is right and just and what affects the citizens of the State collectively." *Palmateer v. Int'l Harvester Co.,* 421 N.E.2d 876, 878 (Ill. 1981). Public policies are different from "purely personal" matters. *Id.* Thus, the tort applies in situations where an employee is fired for refusing to violate a statute and not where a worker is fired over a disputed company policy. *Id.*

at 879 (citing cases). The tort is narrow, however, and the Illinois Supreme Court "has deflected many attempts to expand this tort and has maintained retaliatory discharge as a limited . . . exception to the general rule of at-will discharges." *Paz v. Commonwealth Edison,* 732 N.E.2d 696, 701 (Ill. App. Ct. 2000).

The parties agree that Plaintiffs were fired, though the exact date of the termination is in dispute. And, Plaintiffs have at least established a genuine dispute over whether they were terminated for their activities relating to Yurkovich's investigation. The only element at issue, then, is whether the termination violated Illinois public policy. Had Plaintiffs come forward with enough evidence to establish a conspiracy, their termination might have been in violation of Illinois public policy, because in such a case, the termination itself would violate the Fifth Amendment and its counterpart in the Illinois Constitution. A termination that itself violates the state and federal constitutions would most likely be considered against public policy. *Cf. Palmateer,* 421 N.E.2d at 879.

But, in the absence of a conspiracy, the termination does not violate any of Plaintiffs' state or federal constitutional rights. The question, then, is whether an otherwise lawful termination violates public policy when the decision is related to an employee exercising his personal rights outside of the workplace. Plaintiffs have not cited, and the Court cannot find,

any case similar to the facts here where a court sustained a retaliatory discharge claim. Plaintiffs argue that they were terminated because they refused to give up their Fifth Amendment privilege against self-incrimination. But the privilege against self-incrimination a personal privilege that protects a person from **government** "intrusion to extract self-condemnation," *Couch v. United States,* 409 U.S. 322, 328 (1973), and the Court cannot find any authority to support the proposition that asserting the privilege shields a person from **private** consequences.

To the contrary, the Illinois Supreme Court has referenced other constitutional rights explicitly as not being able to supply the public policy basis for a retaliatory discharge claim. *Barr v. Kelso-Burnett Co.,* 478 N.E.2d 1354, 1356–57 (Ill. 1985) (finding that no public policy is violated when a private employer terminates an employee because of the employee's speech, which is protected by the First Amendment). Based on this authority, the Court cannot find that a private employer's choice to terminate an employee for asserting the Fifth Amendment violates Illinois public policy. Like the First Amendment, the Fifth Amendment's public policy is tied only to government action. *See, id.* Thus, Plaintiffs have failed to establish their claim of common-law retaliatory discharge.

## IV. CONCLUSION

For reasons stated herein, the Defendants' Motions for

Summary Judgment [ECF Nos. 137 and 142] are granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:12/29/2014